[L. A. No. 8546. In Bank.—June 30, 1927.]

IRENE ELIZABETH CAPRON, as Administratrix, etc., of the Estate of SARAH F. DONLEY, Deceased, et al., Respondents, v. ERWIN RAY VAN HORN, Appellant.

[1] Public Lands—Suits to Annul Patents—Statute of Limitations — Act of March 3, 1891 — Construction. — The act of March 3, 1891 (26 Stats. at Large, 1099), limiting the time within which an action to annul a patent may be brought, merely fixes the period of time within which the United States may institute proceedings to vacate and annul a patent issued by mistake or as a result of fraud, and the lapse of such time may be relied upon by a patentee only in defense of actions commenced by the United States, but not in defense of other actions bringing into issue the validity of the patent; and it does not constitute a bar to the assertion of an adverse equitable interest in the land patented.

[2] Id. — Patented Land — Equitable Claimant — Action to Declare Trust — Title. — An equitable claimant to patented land may institute proceedings to have the patentee declared trustee of the title to said lands, but it is not sufficient that such equitable claimant show that the patentee ought not to have received the patent, and it is incumbent upon him to show a better right to the land than the patentee, such as in law should have been respected by the officers of the Land Department, and, being respected, would have given him the patent.

---

2. See 2 Cal. Jur. 993.

[3] ID. — WITHDRAWN FROM ENTRY — REVOCATION OF WITHDRAWAL ORDER — RIGHT OF OCCUPANT AS AGAINST PATENTEE. — One who entered upon public lands of the United States prior to the revocation of an order previously made by the Secretary of the Interior withdrawing said lands from sale and who possessed the necessary qualifications to purchase, vainly tried to purchase the same under the Desert Land Act and who was in possession of the land at the time of the revocation of the order of withdrawal, has a better right to the land than one to whom the United States government issued a patent under a lieu land selection, as the land was not "unreserved" public land subject to disposal by the Land Department, under the act of May 2, 1914, at the time the withdrawal order was revoked, the first claimant then being in occupancy of the land.

[4] ID. — CLAIM OF RIGHT TO PURCHASE — GOOD FAITH. — Where a party entered upon vacant desert land of the United States, bought water stock which became appurtenant to the land, cleared, leveled, and fenced the entire tract, ditched and bordered the same, installed cement headgates, built a house and constructed other permanent improvements upon it, and with his family lived on the same continuously for a period of seven years, conducting farming operations thereon during all that time, the fact that he sought by all available means to protect his rights of settlement under the law as against a later claimant to whom the government issued a patent upon a lieu land claim, did not constitute evidence of lack of good faith on the part of the first claimant.

[5] APPEAL — MAKING FINDINGS ON APPEAL — CONSTRUCTION OF CONSTITUTION AND STATUTE — RULES OF COURT. — Constitutional amendment No. 16, adopted November 2, 1926, amending article VI of the constitution by adding section 4¾, which grants power to the legislature to provide, in certain cases, that findings may be made by courts of appellate jurisdiction, is not self-operative; nor is chapter 352 of the laws of 1927, adding section 956a to the Code of Civil Procedure, providing for such findings of fact on appeal, self-operative, as rules of the supreme court must be promulgated in order to effectuate the purpose of the legislation; nor has the supreme court power to direct a judgment when the existing findings of the trial court would not support the judgment so directed.

(1) 32 Cyc., p. 1055, n. 39, 40.   (2) 32 Cyc., p. 1061, n. 90.   (3) 32 Cyc., p. 808, n. 77, p. 820, n. 66, 74, p. 821, n. 76, p. 872, n. 10. (4) 32 Cyc., p. 807, n. 62 New.   (5) 4 C. J., p. 1123, n. 46, p. 1192, n. 60 New; 12 C. J., p. 739, n. 22.

3.  See 21 Cal. Jur. 787; 22 R. C. L. 249.
5.  See 2 Cal. Jur. 993.

APPEAL from a judgment of the Superior Court of Imperial County. Franklin J. Cole, Judge. Reversed.

The facts are stated in the opinion of the court.

Harry W. Horton for Appellant.

Haines & Haines and J. S. Larew for Respondents.

SHENK, J.—This is an appeal from a judgment of the superior court in and for the county of Imperial. Sarah F. Donley, the patentee of the land in controversy, instituted this action for its recovery and to quiet her title thereto. In his answer to the complaint the defendant denied that the patentee had any right, title, or interest in and to said property or any part thereof and by way of cross-complaint alleged the equitable title to said property to be in himself. The cross-complaint concluded with a prayer that the patentee be required to execute and deliver to the defendant a deed of grant conveying said property to him. After trial the court adjudged the patentee to be the owner and entitled to the possession of the land. An appeal from said judgment was taken by the defendant, which appeal resulted in a reversal of the judgment (*Donley* v. *Van Horn,* 49 Cal. App. 383 [193 Pac. 514]). Thereafter and pending a retrial the patentee died and the present plaintiff was, by order of court, duly substituted in her personal capacity as grantee of the patentee and in her representative capacity as administratrix of the estate of said deceased patentee. Upon the second trial of the cause judgment was again entered in favor of the plaintiff, whereupon the present appeal is prosecuted by the defendant.·

The complicated facts giving rise to this litigation are fully stated in the following portion of the opinion of the district court of appeal rendered upon the first appeal:

"The land, which is situated in Imperial county, has been in the exclusive occupancy of defendant ever since some time prior to December 26, 1911, on which date he filed in the proper office, viz., the local land office at Los Angeles, his application to make entry under the desert land law. The land is a part of a large tract that, on April 2, 1909, was withdrawn from entry by the secretary of the interior in

connection with the Yuma reclamation project, pursuant to
authority conferred by the act of June 17, 1902 (32 Stats.
at Large, p. 388), commonly known as the Reclamation Act
(U. S. Comp. Stats., secs. 4700–4708). This withdrawal was
under what is known as the first form of withdrawal; that
is, it was the withdrawal of lands that, in the opinion of
the secretary of the interior, may be needed in the construc-
tion and maintenance of irrigation works. . . .

"On May 10, 1915, while the land still was withdrawn
from entry or sale under the secretary's withdrawal order
of April 2, 1909, plaintiff, who claimed to be the owner of
a certain section of state school land for which the state
had issued to her a patent, made selection of the land in
controversy under the act of May 2, 1914 (38 U. S. Stats.,
372), in lieu of her school land, and a patent of the lieu
land so selected by her was issued to her by the United
States on August 9, 1916. The act under which plaintiff
made her lieu selection—the act of May 2, 1914—provides
that 'the state of California, or its grantees, may, with
the approval of the secretary of the interior, reconvey to
the United States any of the lands heretofore granted to
said state in the townships authorized to be resurveyed by
the act of July 1, 1912, . . . and select in lieu thereof an
equal amount of vacant, unappropriated, surveyed, unre-
served, nonmineral public lands within said state.' . . .

"Subsequently to the withdrawal of the land from entry
on April 2, 1909, under the first form of withdrawal author-
ized by the act of June 17, 1902, viz., on March 17, 1913,
the reclamation service reported to the secretary of the in-
terior that certain of the lands so withdrawn, including the
land in controversy, were not necessary to the reclamation
project, and recommended the revocation of the withdrawal
order. The day following the filing of this report, viz.,
March 18, 1913, the assistant secretary of the interior in-
dorsed on the report of the reclamation service an order
approving the recommendation. This indorsement did not
operate as an absolute and immediate revocation of the with-
drawal order of April 2, 1909. For, by the express terms
of this order of March 18, 1913, so indorsed on the report
of the reclamation service, the assistant secretary directed
the commissioner of the general land office to ascertain
whether the lands included in the report of the reclamation

service had been otherwise withdrawn or reserved by law, and, if not, to cause notice to be given that they will be open to settlement and entry. at times to be fixed by the commissioner. Before such notice could be given, viz., on April 17, 1913, the order of March 18, 1913, was suspended, after a copy thereof had been forwarded to the register and receiver of the Los Angeles land office. The order that the assistant secretary had so indorsed on the report of the reclamation service on March 18, 1913, was thus suspended 'pending determination of the best method of opening the lands to entry.' At the date of the suspension of the order of March 18, 1913, viz., on April 17, 1913, it was further ordered that the land that plaintiff proposed to select in lieu of her state school land be not restored to entry, in order that the land department might effect the exchange that it was proposed to make with her if and when the bill that later was enacted as the act of May 2, 1914, should become a law. On the same day that this suspension order of April 17, 1913, was made the assistant commissioner of the general land office sent a telegram to the register and receiver of the Los Angeles land office notifying the latter that the order of March 18, 1913, revoking the withdrawal of the lands, had been suspended, and to return the revocation order to the general land office in Washington. This was done. Thereafter no attempt was made by the land department to revoke the original withdrawal order of April 2, 1909, in so far as the land in controversy is concerned, until November 3, 1915, on which date the first assistant secretary of the interior approved a report of the commissioner of the general land office recommending that, as to this land, the withdrawal order of April 2, 1909, be revoked, and that the lieu selection that plaintiff previously had made on May 10, 1915, under the act of May 2, 1914, be approved. The net result of the foregoing is that, as to the land in controversy, the withdrawal order of April 2, 1909, was in full force and effect from the time when it was made until November 3, 1915.

"On December 26, 1911, defendant, as we already have stated, tendered to the local land office in Los Angeles an application to make a desert land entry on the land in controversy. This application was rejected on the ground that the land had been withdrawn from entry by the with-

drawal order of April 2, 1909, and that such withdrawal was still in full force and effect. Defendant appealed successively to the commissioner of the general land office and to the secretary of the interior, by both of whom his right to make such entry while the land was withdrawn for irrigation works was denied. During all these times defendant was a citizen of the United States, possessed of all the qualifications essential to qualify him to make entry upon such of the public lands as might be open to entry and legal settlement. At all times since December 26, 1911, the land has been in the exclusive occupancy of defendant, who went upon it and made settlement with the intention of perfecting a title thereto under the United States land laws as soon as an application to make entry might be favorably acted upon by the land department. During his occupancy he cultivated the land, and, at considerable expense, made valuable improvements thereon. . . .

"On February 17, 1914, which was prior to the passage of the act of May 2, 1914, and while the land was still withdrawn from settlement or entry under the secretary's withdrawal order of April 2, 1909, plaintiff wrote a letter to the land department expressing a willingness to select the land in controversy in lieu of her state school land. The first assistant secretary of the interior, in a letter dated March 21, 1914, addressed to plaintiff, informed her that if the bill then pending in congress, and which subsequently was enacted as the act of May 2, 1914, became a law, its provisions would enable her to make the selection. 'In the meantime,' so the letter runs, 'the Commissioner of the General Land Office has been directed to withhold any of the above tract that you desire to select from restoration to entry. Should H. B. 122 be enacted into law proper steps will be taken by this Department to enable you to make selection of the land in lieu of that claimed by you under the grant from the State of California.' On November 14, 1914, the secretary of the interior notified the commissioner of the general land office that, in view of the fact that the department had knowledge of the character and status of the land that plaintiff desired to select under the act of May 2, 1914, the usual affidavit as to the character and status of lieu land, required by the departmental regulations to be made by persons making such lieu selections,

could be waived. The secretary also notified the commissioner to instruct the local register and receiver to transmit to the general land office at Washington, without action on their part, the papers to be filed by plaintiff in the Los Angeles office when she should make her lieu selection. The commissioner likewise was instructed to take prompt action upon plaintiff's deed of reconveyance and lieu selection, upon receipt thereof. On May 10, 1915, plaintiff filed in the local land office at Los Angeles her lieu land selection whereby she made selection of the land in controversy, and, at the same time, recorded a deed whereby she conveyed to the United States the base land for the lieu selection, viz., the state school land for which she held a patent from the state.

"On June 27, 1915, the commissioner of the general land office transmitted to the secretary of the interior a written report wherein he recommended approval of plaintiff's lieu selection. This report to the secretary of the interior, after reciting the complications and conflicts involved in plaintiff's school section and stating that plaintiff is willing to reconvey her school land to the United States, and, in lieu thereof, select the land in controversy, and after reciting the facts showing the exact status of the land, including defendant's attempted desert land entry and his occupancy, concludes with the following recommendations: (1) That the withdrawal order of April 2, 1909, be revoked and the fixing of dates for settlement and entry waived; and (2) that plaintiff's selection, made May 10, 1915, be approved. On November 3, 1915, these recommendations were approved by the following order indorsed on the commissioner's written report: 'Nov. 3, 1915. Approved and it is so ordered. Andrieus A. Jones, First Assistant Secretary.' Thereafter, on August 9, 1916, the United States issued to plaintiff the patent under which she claims title to the land in controversy."

The district court of appeal, on the former appeal, decided that title had not passed from the United States under the patent issued to the plaintiff's predecessor in interest for the reason that the land purporting to have been so patented was not at the time "vacant" and "unreserved" land within the meaning of the act of May 2, 1914, and that there was a period of time, although short, just before the effectual

moment of the patent, when the defendant was a legal occupant of the land, with improvements thereon made by him, and not a mere trespasser. The judgment decreeing title to be in the patentee and quieting her title was, therefore, reversed. Upon the going down of the *remittitur* the plaintiff on May 18, 1925, filed in the trial court what is termed a ''Supplement to Complaint,'' wherein it was alleged, among other things, that more than six years had elapsed since the issuance of the patent to plaintiff's predecessor in interest and that under and by virtue of that certain act of Congress of March 3, 1891, chapter 561, section 8 (26 Stats. at Large, 1099), the said patent and all said proceedings leading up to it had become absolute and their validity not open to attack on any ground by the United States. The defendant denied that said act of Congress had the effect of validating the patent issued to the plaintiff's predecessor in interest as against him and alleged that said congressional act ''has no reference to suits by an individual brought by reason of private right.''

The act relied upon by the plaintiff in the supplement filed to the complaint reads, in part, as follows: ''Suits by the United States to vacate and annul any patent heretofore issued shall only be brought within five years from the passage of this act, and suits to vacate and annul patents hereafter issued shall only be brought within six years after the date of the issuance of such patents.'' (26 Stats. at Large, 1099.) It appears that the six-year period prescribed for the institution of proceedings by the United States to annul and vacate the patent under which plaintiff claims title had expired subsequent to the decision herein by the district court of appeal upon the former appeal but prior to the filing of said ''Supplement to Complaint.'' The court on the second trial of the cause found, among other things, ''That more than six years have elapsed after the date of the issuance of said patent as aforesaid, and that the United States never brought any action to vacate and annul said patent and that by virtue of that certain act of congress approved March 3, 1891, chapter 561, section 8, of 26 Stats. at Large, page 1099, said patent and all the proceedings in the general land office of the United States in all its departments taken and had leading up to said patent have become absolute and valid from the beginning,

and are not open to attack on any ground, and that said Sarah F. Donley became the owner of the fee title to said land by virtue of said patent." In view of this finding it becomes necessary to determine what effect, if any, the expiration of this statutory period had on the rights of the respective parties.

[1] The decisions of the United States supreme court are uniform to the effect that the act of March 3, 1891, *supra,* merely fixes the period of time within which the United States may institute proceedings to vacate and annul a patent issued by mistake or as a result of fraud, and that the period of limitation therein prescribed may not be availed of by the patentee in defense of other actions bringing into issue the validity of a patent. That this statutory bar may be relied upon by a patentee only in defense of actions commenced by the United States and having for their purpose the annulment of a patent is indicated in the case of *United States* v. *Winona etc. R. R.,* 165 U. S. 463, 475 [41 L. Ed. 789, 17 Sup. Ct. Rep. 368, see, also, Rose's U. S. Notes], where it is stated that Congress "has distinctly recognized the fact that when there are no adverse individual rights, and only the claims of the Government and of the present holder of the title [are] to be considered, it is fitting that a time should come when no mere errors or irregularities on the part of the officers of the land department should be open for consideration. In other words, it has recognized that, as against itself in respect to these land transactions, it is right that there should be a statute of limitations; that when its proper officers, acting in the ordinary course of their duties, have conveyed away lands which belonged to the Government, such conveyances should, after the lapse of a prescribed time, be conclusive against the Government, and this notwithstanding any errors, irregularities or improper action of its officers therein." Further along in the opinion it is declared: "There can be no question of the power of Congress to terminate, by appropriate legislation, any suit brought to assert simply the rights of the Government."

The case of *United States* v. *Chandler-Dunbar Co.,* 209 U. S. 447, 450 [52 L. Ed. 881, 28 Sup. Ct. Rep. 579], from which the plaintiff attempts to derive some comfort, also holds that "This statute must be taken to mean that the

patent is to be held good and is to have the same effect against the United States that it would have had if it had been valid in the first place.''

In *United States* v. *Whited & Wheless,* 246 U. S. 552, 561, 562 [62 L. Ed. 879, 38 Sup. Ct. Rep. 367], it was held that while the expiration of the six years' period precluded the federal government from annulling the patent therein involved, it did not constitute a bar to the government's right of action to recover the value of the lands fraudulently procured under said patent. In reaching such a conclusion the court stated: ''The statute of limitations did not create the right of action in the Government or either of the remedies for enforcing that right. It relates to the remedy, and in terms applies only to one remedy, that for annulling the patent. . . . The statute was passed to promote prompt action for annulling patents where cause therefor was believed to exist and to make titles resting upon patents dependably secure when the period of limitation should expire.''

The foregoing authorities definitely establish that the running of the period prescribed in the act of March 3, 1891, *supra,* has no other effect than to make the title in the patentee good as against the grantor—the United States. That the expiration of said statutory period within which the federal government might proceed to annul a patent does not preclude a person other than the patentee from asserting and enforcing an interest adverse to that of the patentee was decided in the case of *United States* v. *New Orleans Pac. Ry. Co.,* 248 U. S. 507 [63 L. Ed. 388, 39 Sup. Ct. Rep. 175]. That action was instituted by the United States for and on behalf of certain homestead claimants, who were permitted to intervene. It was sought therein to procure the annulment of the defendant's patents to certain lands or, if that relief be denied, to have the defendant decreed to be trustee of the title to said land for the homesteaders. Construing a statute of limitation similar to the one here involved the court said: ''As the patents were issued before, and the suits were brought more than five years after, the Act of March 2, 1896, c. 39, 29 Stats. 42, the prayer that the patents be canceled must be put out of view, and the alternative prayer—that the title under the patents be declared to be held in trust for the homestead claimants and the trust enforced—must be regarded as if standing alone.''

It is readily apparent from a reading of that decision that the equitable claimant to patented land may assert and enforce. his adverse interest therein even though as against the United States the patent has become valid and conclusive by the running of the period limited for the institution of proceedings by the government to annul such patent.

It follows from what has been said that the expiration of the six-year period prescribed in the act of March 3, 1891, may be availed of by a patentee under the federal government only in defense of an action brought by said government to annul the patent. It does not constitute a bar to the assertion and enforcement of an adverse equitable interest in and to the land so patented. This being so, the trial court's finding, quoted above, to the effect that the plaintiff's patent and the proceedings leading to the issuance thereof "have become absolute and valid from the beginning, and are not open to attack on any grounds," was erroneous and prejudicially affected the adverse equitable claim advanced by the defendant in his cross-complaint.

[2] That an equitable claimant to patented land may institute proceedings to have the patentee declared trustee of the title to said land has been determined upon numerous occasions. The cases indicate, however, that it is not sufficient that such equitable claimant show that the patentee ought not to have received the patent, but it is incumbent upon him to show a better right to the land than the patentee, such as in law should have been respected by the officers of the Land Department, and being respected, would have given him the patent. (*Sparks* v. *Pierce,* 115 U. S. 408, 413 [29 L. Ed. 428, 6 Sup. Ct. Rep. 102, see, also, Rose's U. S. Notes]; *Lee* v. *Johnson,* 116 U. S. 48, 49 [29 L. Ed. 570, 6 Sup. Ct. Rep. 249]; *Duluth & Iron Range R. R.* v. *Roy,* 173 U. S. 587, 590 [43 L. Ed. 820, 19 Sup. Ct. Rep. 549].) In the case of *Bohall* v. *Dilla,* 114 U. S. 47, 50 [29 L. Ed. 61, 5 Sup. Ct. Rep. 782], it is recognized that "The system of pleading in civil cases in the courts of California permits an equitable defense to be set up in a special count, by way of cross-complaint, in the answer to an action for the possession of lands. The cross-complaint is in the nature of a bill in equity, and must contain its material allegations, disclosing a case which, if established, would entitle the defendant to a decree . . . directing that the title

be conveyed to him.'' The defendant herein has followed the procedure indicated in the case last cited.

[3] It remains to determine whether the defendant has established a better right to the land than the patentee and her successor in interest and a right to the conveyance prayed for. It will be remembered from the statement of facts that the land had been withdrawn by the Secretary of the Interior from entry and selection by an order bearing date April 2, 1909, and that defendant entered and settled upon the land prior to the revocation of said order of withdrawal. The defendant's occupancy of the land during all of the time that the order of withdrawal was in force was, of course, ·no better than that of a trespasser, and any improvements were made at his own risk. However, the fact that defendant's entry upon the land was unauthorized would not prevent his occupancy from becoming lawful if, before any right could vest in a third person, the withdrawal order should be revoked and the land again restored to settlement and entry while occupied by the defendant. To preclude the defendant's occupancy from thus assuming the character of lawfulness the respondent urges that the revocation of the withdrawal order and the approval of the patentee's lieu selection took place at the same instant, without any interval of time intervening. ''If the revocation of the withdrawal order and the approval of respondent's lieu selection were so absolutely synchronous that no instant of time whatever, however short, elapsed between the revocation of the withdrawal and the approval of respondent's lieu selection, then it necessarily follows that, at the very instant when the secretary approved respondent's lieu selection, the land still was under the spell of the withdrawal order, and that, therefore, when her selection was approved the land was not 'unreserved' public land subject to disposal by the land department under the act of May 2, 1914.'' (*Donley* v. *Van Horn, supra,* p. 393.) Inasmuch as the land in question was not ''vacant'' and ''unreserved'' land at the time the plaintiff's predecessor secured approval of her lieu selection, such selection and approval were unauthorized under the act of May 2, 1914, and the patent purporting to grant said land was unauthorized, and plaintiff's predecessor in interest acquired no right or title in or to said land by virtue of the patent except as against the United States upon

the expiration of the period of limitation. This being so, the defendant's occupancy, theretofore ineffectual, became lawful, for "at the very instant that the withdrawal order was revoked, the land became open to entry, and appellant, who had occupied the land all this time, waiting for the day when he lawfully could make entry under the public land laws; who had made valuable improvements; who, possessing the necessary qualifications, had vainly tried to enter the land under the Desert Land Act; who diligently prosecuted appeals from adverse decisions of the local land officers and the commissioner of the general land office to the secretary of the interior himself, and whose every act betokens a patient awaiting of the time when he could make lawful entry under the public land laws, became a lawful settler in actual and lawful occupation, and at that very instant the land ceased to be 'vacant' " (*Donley* v. *Van Horn, supra*).

In *Moss* v. *Dowman*, 176 U. S. 413, 420 [44 L. Ed. 526, 20 Sup. Ct. Rep. 429], one Doran had made a homestead entry of the land there in controversy on May 7, 1890, without occupying the same. Thereafter and on September 18, 1890, Dowman went upon said land, built a cabin and continued to live there. Moss subsequently paid Doran $1,000 for the relinquishment of his homestead entry, which relinquishment was filed in the local land office by Moss on October 24, 1890, and a homestead entry made in her (Moss') own name. Said Moss thereafter occupied the land. In a contest between Dowman and Moss as to which had the right to acquire title to the land, the Secretary of the Interior determined in favor of Dowman and a patent issued to him. The United States supreme court affirmed the decision of the Secretary of the Interior, declaring, in part: "At the moment of filing that relinquishment, Dowman, the defendant, was a settler in occupation of the tract, and Moss, the plaintiff, made her application to enter, and the question is as to the relative rights, at the moment the land becomes open to entry, of one a settler in actual occupation and one making a formal entry in the land office. For reasons heretofore stated, we have no doubt that the settler is entitled to preference. . . . That Dowman had acquired no rights by his settlement prior to Doran's relinquishment, and might as respects Doran have been regarded as a trespasser, makes no difference. When Doran relinquished Dowman ceased to

be a trespasser, and was not only an actual but a lawful settler. There was no evidence of *mala fides* about Dowman's settlement which should affect its legality when the time came for a right to attach to it under the land laws. Neither Doran nor any of the long line of speculative homesteaders who had kept up holdings by entries and relinquishments every six months had ever appeared on the land. The object of the homestead laws is not to encourage speculation, but settlement, and if Dowman knew all the antecedent facts he might well expect that an actual settler would acquire the right to the land, lawfully, upon the next relinquishment, and make his settlement as the Secretary finds as a fact that it was made—in good faith.''

In the case of *Svor* v. *Morris,* 227 U. S. 524, 527 [57 L. Ed. 623, 33 Sup. Ct. Rep. 385], the defendant had settled upon land not then open to entry because of a prior indemnity withdrawal. The court assumed, without deciding, that such original and wrongful entry established no right in the defendant, but concluded that ''he was not disqualified by reason of what he had done before'' from acquiring the land and that ''it was not necessary that he should go through the idle ceremony of vacating the land and then settling upon it anew.''

[4] The record on this appeal consists of the judgment-roll and a bill of exceptions. In addition to the finding that the patent was valid as against the defendant by reason of the lapse of the six-year period from the issuance thereof the court also found that the possession, use, and occupation taken, made, and held by the defendant was not in good faith. Aside from the documentary evidence above referred to, the only evidence appearing in the bill of exceptions bearing on the subject of good faith is that of the defendant himself. He testified that he went upon the land in 1912. At that time it was in its desert state, with no improvements upon it whatsoever. He bought water stock, which is now appurtenant to the land. He cleared, leveled, and fenced the entire tract. He ditched and bordered the land and installed cement headgates. He built a house and constructed other permanent improvements. He moved on the land with his family in 1912 and lived on the same continuously from that time until 1919, conducting farming operations thereon during all of that time. This action was

commenced on February 1, 1917. The defendant went on the land when no other claimant was in sight or apparently in being, and at all times intended to and did reclaim it at great expense. There is in the record no evidence of lack of good faith and the finding is unsupported. The fact that a claimant later appeared and that the defendant has sought by all available means to protect his right of settlement under the law do not constitute evidence of lack of good faith. There was never a time when the plaintiff's predecessor in interest could have legally made an entry on the land owing to the fact that, by the terms of the act of Congress under which the plaintiff claims, the occupancy of the defendant at the very time such entry was attempted to be made precluded such entry. The defendant made application for the land under the desert land law and made his payment as required by law. After rejection of his original application he renewed the same and the Land Department still retains the money. On the record before us it is clear that his claim should have been recognized. We attach no controlling importance to the fact that he accepted from the government a patent to a portion of the land included within his original application, which portion was not sought to be patented by the plaintiff's predecessor in interest. He thereby merely took what he was lawfully entitled to take and was not estopped from claiming what was further due him.

By reason of the trial court's erroneous conclusion that the statute of limitation had in effect confirmed the patent here involved in the plaintiff's predecessor in interest and was a bar to any relief to the defendant on his cross-complaint, and further by reason of the fact that the findings are otherwise unsupported, as above indicated, the judgment must be reversed.

[5] We are asked, in the event of a reversal, to direct the trial court to enter a judgment in favor of the defendant on his cross-complaint. The legal title to the land in suit is unquestionably in the plaintiff. The federal government appears to have no further interest in the same. This litigation is now resolved into a controversy between the plaintiff and the defendant, and as the facts are undisputed the situation might present a case wherein this court could make its own findings consistent with and in support of the judg-

ment sought to be ordered if the legislation designed to authorize courts on appeal to make findings of fact contrary to those made by the trial court were now effective. But bearing on this subject constitutional amendment number 16, adopted at the last general state election amending article VI of the constitution by adding thereto section 4¾, is not self-operative. Nor is chapter 352 of the Laws of 1927, adding section 956a to the Code of Civil Procedure and providing for such findings of fact on appeal, yet in effect. When that section becomes a law by reason of the constitutional lapse of time it will not even then be self-operative, for the reason that rules of this court must thereafter be promulgated in order to effectuate the purpose of the legislation. At the present time this court has no power to make findings. Nor has it the power to direct a judgment when the existing findings of the trial court would not support the judgment so directed. (*Bank of British Columbia* v. *Frese,* 116 Cal. 9, 16 [47 Pac. 783] ; 2 Cal. Jur. 993.) This case does not, therefore, present a situation where the court would now be justified in directing a judgment as requested. Accordingly the only appropriate order is an order of reversal.

The judgment is reversed.

Waste, C. J., Curtis, J., Preston, J., Langdon, J., and Seawell, J., concurred.

Rehearing denied.